UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

               Plaintiff,

    vs.                        Case No. 11-CV-341-WMC

ADVANCE AUTO BODY, LLC,
SHAWN BIERD and KATRINA BIERD,      Madison, Wisconsin
                             August 30th, 2012
             Defendants.     1:30 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF HEARING
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiff:   United States Department of Justice
                   Tax Division
                   BY:  MIRANDA BUREAU
                   P.O. Box 7238
                   Washington, DC 20044

For the Defendants:  Advance Auto Body, LLC
                   2533 Advance Road
                   Madison, Wisconsin 53718
                   PRO SE

                   Shawn Bierd
                   1754 N. Jargo Road
                   Deerfield, Wisconsin  53531
                   PRO SE

CHERYL A. SEEMAN, RMR, CRR
Official Court Reporter
United States District Court
120 North Henry Street, Room 520
Madison, Wisconsin  53703
1-608-255-3821

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:  Katrina Bierd
                          1754 N. Jargo Road
 3                        Deerfield, Wisconsin  53531
                          PRO SE
 4
     Also Present:        Bart Brellenthin, IRS
 5

 6                        I-N-D-E-X

 7   GOVERNMENT'S WITNESS         EXAMINATION           PAGES

 8   SHAWN BIERD              Adverse by Ms. Bureau     7-30

 9                     E-X-H-I-B-I-T-S

10   GOVERNMENT'S EXHIBITS                IDENTIFIED  RECEIVED

11   Ex. 1 - Check Ledger                    14          -
     Ex. 2 - Payroll Summary                 16          -
12   Ex. 3 -        "                        24          -

13                            ***

14

15        (Called to order.)

16          THE CLERK:  Case No. 11-CV-341-WMC, United

17   States of America v. Advance Auto Body, LLC, Shawn Bierd

18   and Katrina Bierd, is called for a hearing.  May we have

19   the appearances, please?

20          MS. BUREAU:  Miranda Bureau for the United

21   States.

22          THE COURT:  And you should state your

23   appearances.

24          MR. BIERD:  Shawn Bierd representing Advance

25   Auto Body.
```

1          THE COURT:  Are you an attorney, Mr. Bierd?

2          MR. BIERD:  Absolutely not.

3          THE COURT:  Yeah.  You're not able to represent

4  your company because it's an LLC.  It's incorporated

5  under the laws of the state of Wisconsin, and as such, it

6  takes advantage of the benefits of those laws, but it

7  also bears the requirement of being represented by

8  counsel.  So your appearance is noted for yourself, but

9  unfortunately, you cannot appear for your company.  And,

10  Mrs. Bierd, you should state your appearances.

11          MRS. BIERD:  Katrina Bierd.

12          THE COURT:  Very good.  This case is set for a

13  hearing on a motion for contempt and to establish a

14  default judgment.  On December 23rd the Court found

15  defendant Auto Body, LLC in default for failing to

16  appear.

17      More recently the Court found Shawn Bierd and his

18  wife Katrina Bierd in default for failing to comply with

19  the Court's order compelling discovery.  In that same

20  order the Court set this hearing to determine whether to

21  hold the individual defendants in civil contempt,

22  including incarcerating them to force compliance with the

23  ordered to compel discovery and with the terms of the

24  preliminary injunction.

25      This order was personally served on Shawn Bierd by

1  the marshals on August 20.  And I appreciate the Bierds

2  appearing before the Court today so that we could avoid

3  having to send the marshals out to arrest you.

4      I understand that Mrs. Bierd did appear this morning

5  for a deposition; is that correct?

6          MS. BUREAU:  That's correct, Your Honor, she

7  did.

8          THE COURT:  All right.  Then can you tell me

9  where we stand in terms of compliance with the discovery

10 requests?

11         MS. BUREAU:  Certainly, Your Honor.  Mrs. Bierd

12 has complied with her responsibility to appear for a

13 deposition.  We also served a document request that was

14 identical on both Katrina Bierd and Shawn Bierd.  Based

15 on Mrs. Bierd's testimony this morning, I am satisfied

16 that she has complied with the court orders in this case

17 to the best of her ability.

18     It appears that Mr. Bierd is currently more in

19 control of the affairs of the business.  Mr. Bierd, this

20 morning, did produce some Quickbooks reports in response

21 to the document request.  He claimed that he did not have

22 bank statements or cancelled checks or other documents

23 that are requested.  The government doesn't have enough

24 information to know whether or not that's the case.  In

25 terms of the preliminary injunction order, however,

1  Mr. Bierd has not complied with the terms of the

2  preliminary injunction order.

3      THE COURT:  And specifically, which portions of

4  those terms are you looking for compliance on?

5      MS. BUREAU:  The filing of 941 returns and the

6  paying over of the employment taxes for the employees of

7  Advance Auto Body.

8      THE COURT:  All right.  Then I will hear from

9  you, Mr. Bierd, as to why -- first of all, do you agree

10  that you have not complied in turning over 941 returns or

11  withholding tax -- employment tax from your employees?

12      MR. BIERD:  The dates listed, I don't believe we

13  had any employees.

14      THE COURT:  Okay.  Have you -- did you attempt

15  to take the deposition of Mr. Bierd?

16      MS. BUREAU:  I did not, Your Honor.  I had

17  planned to do that earlier.  And then when Mrs. Bierd did

18  not comply, we didn't receive a document request, because

19  I didn't have documents at the time, I pursued things

20  with the Court to try to get that discovery complied

21  with.

22      THE COURT:  All right.  It's your position that

23  he hasn't complied.  On the other hand, I don't know what

24  his position is and I think we need to examine him under

25  oath.

1          MS. BUREAU:  Yes, Your Honor.

2          THE COURT:  So are you prepared to proceed in

3    open court to do that or do you want to take a

4    deposition?

5          MS. BUREAU:  I'm prepared to proceed in court,

6    Your Honor.

7          THE COURT:  All right.  Before I call you

8    forward, Mr. Bierd, to testify, let me ask if you have

9    any general statement you wish to make in terms of your

10   alleged failure to comply with the discovery requests and

11   with the injunction that the Court entered.

12         MR. BIERD:  With all due respect to the people

13   involved in this case, I don't -- I still don't

14   understand why my wife was required to make a deposition.

15   She has no information with regards to this.

16         THE COURT:  The good news is we're no longer

17   concerned with your wife because the government believes

18   she's discharged her duties.

19         MR. BIERD:  Okay.

20         THE COURT:  So the question is if you wish to

21   make any preliminary statement as to why -- well, as to

22   whether you are in compliance with the discovery requests

23   and the injunction that the Court entered in this case or

24   if you are not in compliance, why not.

25         MR. BIERD:  Well, I kind of -- I don't really

1   under the question.

2          THE COURT:  Well, then you don't wish to make a

3   statement?

4          MR. BIERD:  Yeah.  Well, I would be open to a

5   deposition.

6          THE COURT:  We're past depositions, sir.  You're

7   about to be sworn in as a witness.

8          MR. BIERD:  I have never been invited to a

9   deposition, that I know of.

10          THE COURT:  That's fine.  Then you should step

11   forward, and please step forward here, and be sworn in

12   and you will be examined under oath.

13          MR. BIERD:  Okay.

14          THE COURT:  If you just stand and raise your

15   right hand.

16               **SHAWN BIERD, DEFENDANT, SWORN**

17                    <u>ADVERSE EXAMINATION</u>

18   BY MS. BUREAU:

19   Q.   Good afternoon, Mr. Bierd.

20   A.    Hi.

21   Q.   Are you the owner of Advance Auto Body?

22   A.   I am the manager of that entity, yes.

23   Q.   What does Advance Auto Body do?

24   A.   Advance Auto Body serves the needs of the community

25   in the east portion of Madison with regard to damage to

1    their automobiles.

2         THE COURT:  And, Mr. Bierd, I want to make sure

3    I understood your earlier answer.  Do you hold the shares

4    in LLC?

5         THE WITNESS:  Well, that's probably something

6    that I should clarify.  We originally, under the advice

7    of an attorney, set the company up as an LLC.  We decided

8    to terminate that status probably close to -- at least

9    eight years ago.

10        THE COURT:  So you haven't operated as an LLC

11   for eight years?

12        THE WITNESS:  That's correct.

13        THE COURT:  Did you file -- I'm sorry, stay with

14   me -- did you file notice with the State of Wisconsin

15   that you were dissolving the LLC?

16        THE WITNESS:  Well, they had sent us some

17   paperwork that it was delinquent as far as reporting

18   requirements and such like that.  And she said they were

19   going to dissolve it and we figured that was good enough.

20        THE COURT:  And when was that?

21        THE WITNESS:  2005.

22        THE COURT:  All right.  And since then you've

23   been operating essentially as a DBA?

24        THE WITNESS:  In name only.

25        THE COURT:  In name.  But it's your business

SHAWN BIERD - ADVERSE

1   then?

2          THE WITNESS:  Yeah.

3          THE COURT:  Let me say it differently.

4          THE WITNESS:  I repair the cars, yes.

5          THE COURT:  You own -- you operate as Advance

6   Auto Body, you personally?

7          THE WITNESS:  Yeah.  I mean --

8          THE COURT:  No, it isn't a *yeah*.  You either do

9   or you don't.  Does somebody else own any of the assets?

10          THE WITNESS:  No.

11          THE COURT:  So it's your business?

12          THE WITNESS:  It's just me.

13          THE COURT:  And it's operating as a BDA doing

14   business as -- you're doing business as Advance Auto

15   Body; is that correct?

16          THE WITNESS:  That sounds correct.

17          THE COURT:  What part are you uncertain about?

18          THE WITNESS:  Well, I mean, it depends on your

19   definition of "operating a business."  I fix cars and by

20   necessity I guess I have to call myself a business and

21   that's my livelihood.

22          THE COURT:  Well, you advertise yourself as

23   Advance Auto Body?

24          THE WITNESS:  Correct.  That's the name that our

25   customers identify us with.

SHAWN BIERD - ADVERSE

```
 1              THE COURT:  Does anyone else work at that
 2   location for you?
 3              THE WITNESS:  I have several independent
 4   contractors, correct.
 5              THE COURT:  And what are their names?
 6              THE WITNESS:  It varies.  I know a lot of people
 7   in the business.
 8              THE COURT:  Okay.  Let's start as of right now,
 9   who's doing work for you?
10              THE WITNESS:  My son, Trent Bierd.
11              THE COURT:  Okay.
12              THE WITNESS:  And Fritz Weber.  And years, I'm
13   kind of drawing a blank.
14              THE COURT:  I'm talking about right now.
15              THE WITNESS:  Right now?
16              THE COURT:  Yeah.
17              THE WITNESS:  That's pretty much it.
18              THE COURT:  All right.  Go back one year.  Is
19   there anyone else?
20              THE WITNESS:  That's what I'm trying to think
21   of.  I apologize.  I'm a little nervous here.
22              THE COURT:  I'm not buying that for a second,
23   sir.  You need to tell me what you remember in the last
24   year.  You don't seem the least bit nervous.  What other
25   employees -- what other people did work for Advance Auto
```

SHAWN BIERD - ADVERSE

1  Body in the last year?  You're telling me you can't

2  remember a single person?

3           THE WITNESS:  I don't remember at all.

4           THE COURT:  What about the last five years?

5           THE WITNESS:  I don't have that many people

6  helping.

7           THE COURT:  You can't think of a single other

8  person?

9           THE WITNESS:  I have, if -- I have a listing on

10  my -- Miranda has the only copy.

11           THE COURT:  Of the list of your employees?

12           THE WITNESS:  Correct.

13           THE COURT:  All right.  I will give it back to

14  you then, Counsel, to proceed.

15  BY MS. BUREAU:

16  Q.   Sir, Advance Auto Body -- where is Advance Auto Body

17  located?

18  A.   Street address?

19  Q.   Yes, please.

20  A.   2533 Advance Road; Madison, Wisconsin.

21  Q.   In the past you have filed Forms 941 with the

22  government; is that right?

23  A.   Correct.

24  Q.   And that was because the IRS made assessments

25  against Advance Auto Body for employment taxes; is that

1  right?

2  A.    Correct.

3  Q.    And during that time you were not making federal tax

4  deposits really to those employees, were you?

5  A.    I'm sorry?

6  Q.    You were not making federal tax deposits, were you?

7  A.    No, ma'am.

8  Q.    You mentioned Mr. Weber as an independent

9  contractor.  Can you describe what Mr. Weber does for

10  Advance Auto Body?

11  A.    Well, I try to handle most of the repair load, I

12  myself.  Occasionally I get overwhelmed and he would fill

13  in for anything I can't keep up on.

14  Q.    Does he work on cars?

15  A.    Correct.

16  Q.    Does he use tools in his work on cars?

17  A.    Yeah.

18  Q.    Where does he obtain those tools?

19  A.    They're mine.

20  Q.    Where does he perform the work on cars?  When he

21  works on cars, where does he perform that work?

22  A.    At the business.

23  Q.    Do you have a contract with Mr. Weber?

24  A.    That's correct.

25  Q.    Do you have that with you today?

1    A.    Huh-uh.

2    Q.    When did you enter into that contract with

3    Mr. Weber?

4    A.    I don't recall.

5    Q.    How many hours per week does Mr. Weber work?

6    A.    Generally speaking?

7    Q.    Yes.

8    A.    I would say maybe 20, up to 20.

9    Q.    How many hours did Mr. Weber work last week?

10   A.    I don't recall.

11   Q.    And the week before that, how many hours did he

12   work?

13   A.    I can generalize and say 20 to 30 hours.

14   Q.    What time of day does Mr. Weber arrive at the

15   workplace?

16   A.    Hard to say.  Sometimes nine, maybe ten.

17   Q.    When he arrives, how does he know what cars to work

18   on?

19   A.    Whatever is there and I direct him to work on, he

20   works on.

21   Q.    How much do you pay Mr. Weber?

22   A.    It's by the job as a percentage.

23   Q.    The last job that he worked, how much did you pay

24   him?

25   A.    I don't recall.

 1  Q.   The job before that, how much did you pay him?

 2  A.   I don't have any of these records with me.

 3          THE COURT:  Where are those records?

 4          THE WITNESS:  At my shop.

 5          THE COURT:  Have they been requested?

 6          MS. BUREAU:  They were not, Your Honor.  This

 7  morning is the first that we've heard that he's claiming

 8  to have independent contractors.

 9          THE COURT:  All right.  You may proceed.

10  BY MS. BUREAU:

11  Q.   How do you pay Mr. Weber?

12  A.   By check, typically.

13  Q.   And how often do you pay him?

14  A.   Well, I'd like -- it depends, by the job or weekly.

15  Q.   Did you produce to me this morning check ledgers for

16  Advance Auto Body from Quickbooks?

17  A.   That's correct.

18          MS. BUREAU:  May I approach, Your Honor?

19          THE COURT:  You may.

20          MS. BUREAU:  I'm going to mark Government

21  Exhibit No. 1.  I'm sorry, I don't have a sticker.

22          THE COURT:  That's fine.  If you provide it to

23  the clerk, you can do that.  That's fine.  I will have a

24  copy.  If there's something you believe I need to see,

25  you can use the Elmo.  You have to slide it out to the

SHAWN BIERD - ADVERSE

1  right.  I guess we now call it the *document imager*.

2           MS. BUREAU:  Thank you, Your Honor.

3  BY MS. BUREAU:

4  Q.   Mr. Bierd, is this one of the ledgers that you

5  provided to me this morning?

6  A.   Correct.  Well, a copy, right, or is this the

7  original?

8  Q.   I believe that is your original.

9  A.   Okay.

10 Q.   Can you tell me what is written in marker on the

11 top?

12 A.   "Check Ledger, 67 Pages, 4/1/03 to Present."

13 Q.   Okay.  So does this check ledger go through recent

14 dates in 2012?

15 A.   It would go up to the last transaction put into that

16 account.  It may not be -- you know, I believe I printed

17 them on the 27th.

18 Q.   Can you look at the last page for me, page 67?

19 A.   Okay.

20 Q.   What is the last date entered there?

21 A.   7/31/12.

22 Q.   Can you look through the 2012 entries in this ledger

23 and tell me where there is a check for Mr. Frederick

24 Weber?

25 A.   In 2012?

1   Q.   Yes.

2   A.   None.

3   Q.   Can you look through the 2011 entries and tell me

4   where there is a check for Mr. Frederick Weber?

5   A.   I don't see any.  Is that a trick question?

6            THE COURT:  You didn't --

7   A.   I don't think there is any on it.

8            THE COURT:  There was no trick involved, sir.

9            THE WITNESS:  Well, I can't find one.

10           THE COURT:  Next question, Counsel.

11  BY MS. BUREAU:

12  Q.   I would like to show you what's marked as Exhibit 2,

13  sir.  Do you see that Exhibit 2 is before you?

14  A.   Correct.

15  Q.   Did you produce this document to me this morning?

16  A.   I did.

17  Q.   And can you tell me what's written in marker on the

18  top of the page?

19  A.   "Check Ledger, 18 Pages, April 1st, '03 to Present."

20  Q.   Can you look at the last page, please?

21  A.   Okay.

22  Q.   What is the date of the last entry there?

23  A.   8/27/12.

24  Q.   Can you look through the 2012 entries, please, and

25  tell me if you see an entry for Mr. Weber?

SHAWN BIERD - ADVERSE

1  A.   I don't think there will be any in there.

2  Q.   And why is that, sir?

3  A.   Well, the entries were entered as *Cash*.

4  Q.   So you didn't write a check to him then?

5  A.   I had wrotten a check to him.  I might have put it

6  in the ledger as *Cash*.

7  Q.   And why would you put it in as *Cash* rather than

8  writing his name?

9  A.   To protect his anonymity.

10 Q.   And why do you want to protect his anonymity?

11 A.   Well, I know this would be becoming public record

12 and he's an independent contractor.  I don't believe I

13 have the right to bring him into any controversy.

14 Q.   Did a process server visit your business location

15 this past Friday?

16 A.   I don't recall.

17 Q.   You don't recall a process server asking for

18 Mr. Weber --

19 A.   Yes.

20 Q.   -- on Friday?

21 A.   Yes.

22 Q.   What did you tell that process server?

23 A.   He wasn't there.

24 Q.   Did you tell him that he no longer worked there?

25 A.   Huh?  I don't believe he asked me any questions.  He

1  asked if Frederick Weber is here.  And I said no, he's

2  not here, and that he would be probably better off

3  getting him at his home.

4  Q.    And where does Mr. Weber live?

5  A.    Somewheres in Mount Horeb.

6  Q.    Is there a document that you have that would reflect

7  his address?

8  A.    Maybe somewheres.

9          THE COURT:  Have you ever been to his home?

10          THE WITNESS:  I have been to his home.

11          THE COURT:  So when you drove to Mount Horeb,

12  where did you go?

13          THE WITNESS:  It's a small town near Mount

14  Horeb.  It consists of, like, ten houses.  I don't know

15  the name of the town.  I apologize.  It's near Mount

16  Horeb.

17  BY MS. BUREAU:

18  Q.    Sir, have you filed a Form 1099 related to

19  Mr. Weber?

20  A.    Not that I recall.

21  Q.    So in the records that you've given me today, there

22  aren't any records of what payments are to Mr. Weber; is

23  that right?

24  A.    I don't think so.

25  Q.    How would you know how much you've paid him in the

1   past year?

2   A.   I probably wouldn't even know that.

3   Q.   Are there any other people working with you at the

4   current time?

5           THE COURT:  Besides Mr. Weber and Trent Bierd?

6           MS. BUREAU:  I was asking besides Mr. Weber.

7   A.   Not that I recall.  And I knew -- I have a lot of

8   people stop by and I had a lot of help from a lot of

9   people.  And I don't know -- some of them haven't been

10  compensated, some of them have been, and I honestly don't

11  keep track of them.

12          THE COURT:  As you sit here on the stand under

13  oath, you're telling me you don't remember a single other

14  person's name of someone that you paid to do work at your

15  shop?

16          THE WITNESS:  Bill Stewart.

17          THE COURT:  How do you spell his last name?

18          THE WITNESS:  S-T-E-W-A-R-T.

19          THE COURT:  And where does he live?

20          THE WITNESS:  I'm not sure.

21          THE COURT:  Have you ever been to his home?

22          THE WITNESS:  Brooklyn.

23          THE COURT:  Brooklyn, Wisconsin?

24          THE WITNESS:  Correct.

25          THE COURT:  Anyone else that, as you sit here

SHAWN BIERD - ADVERSE

```
 1  under oath --
 2            THE WITNESS:  Gordon Tannahill.
 3            THE COURT:  How do you spell his name?
 4            THE WITNESS:  T-A-N-N-A-H-I-L-L.
 5            THE COURT:  And where does he live?
 6            THE WITNESS:  I'm not sure.  It's been a while.
 7            THE COURT:  You haven't been to his home?
 8            THE WITNESS:  No.
 9            THE COURT:  All right.  Anyone else?
10            THE WITNESS:  My brother.
11            THE COURT:  What's his name?
12            THE WITNESS:  Actually, two of them -- Gabriel
13  Winter and Shane Bierd.
14            THE COURT:  And where do they live?
15            THE WITNESS:  My brother lives in Deerfield.
16            THE COURT:  Which brother?
17            THE WITNESS:  Shane.  Gabriel lives in Columbus.
18            THE COURT:  All right.  Anyone else that you
19  recall?
20            THE WITNESS:  Randall Schmunk.  S-C-H-M-U-N-K.
21  And he lives somewheres up north now.  He used to live in
22  the area.
23            THE COURT:  And when did he do work for you?
24            THE WITNESS:  On and off through the years.
25            THE COURT:  Meaning how recently?
```

SHAWN BIERD - ADVERSE

```
 1            THE WITNESS:  Oh, it's been several years;
 2  probably three, four years.
 3            THE COURT:  All right.  Anyone else that you
 4  recall doing work for you?
 5            THE WITNESS:  If I would have known, I could
 6  have prepared a list.
 7            THE COURT:  Where would you go to look for a
 8  list?
 9            THE WITNESS:  Well, probably mostly from memory.
10  But like I say, as I sit here on the stand and I --
11            THE COURT:  And you wrote all of the checks to
12  those people by simply --
13            THE WITNESS:  They should be in here.  Some
14  should be in here, in the ledger.
15            THE COURT:  All right.  On the first page are
16  there any?  You're talking, when you say "here," Exhibit
17  2?
18            THE WITNESS:  Exhibit 2.
19            THE COURT:  Why don't you continue through until
20  you find an example.
21            THE WITNESS:  There are a lot of pages here.
22  This is a fairly new account.  Exhibit 1.
23            THE COURT:  All right.
24            THE WITNESS:  Brian Wetzel.
25            THE COURT:  He's on the first page of Exhibit 1?
```

```
 1              THE WITNESS:  Correct.

 2              THE COURT:  And that payment there is in his

 3   name, it's a check you wrote, and it was for work he did

 4   for your business; is that correct?

 5              THE WITNESS:  Correct.

 6              THE COURT:  All right.  Do you see others on

 7   that first page?

 8              THE WITNESS:  That's all I see.

 9              THE COURT:  All right.  And you think there

10   should be other indications, although not for Mr. Weber;

11   is that right?

12              THE WITNESS:  Sorry?

13              THE COURT:  You think there should be other

14   indications of checks paid, made payable to

15   individuals --

16              THE WITNESS:  Maybe.

17              THE COURT:  -- on that list?  Why don't you go

18   through and tell me if you see another one.

19              THE WITNESS:  I will.

20              THE COURT:  While Mr. Bierd is doing that, you

21   might want to go to your right and you will see there is

22   a drawer to the right of the podium and you can just pull

23   that out and then just lift the arm.

24              MS. BUREAU:  Okay.

25              THE COURT:  And then if you need to refer to
```

23

```
 1   something for the Court and the witness, you may do so.

 2           MS. BUREAU:  Thank you.

 3           THE COURT:  Mr. Bierd, you're a ways through the

 4   document.  Have you seen an instance of writing a check

 5   in someone's name?

 6           THE WITNESS:  Not yet.

 7           THE COURT:  So, for the most part, the work that

 8   people did, you paid them by writing Cash on a check, is

 9   that your testimony, or at least you didn't enter it into

10   your check ledger?

11           THE WITNESS:  Yeah.  I most likely made the

12   check out to the person.  I may have entered it as Cash

13   or entered it in the person's name.

14   BY MS. BUREAU:

15   Q.   Mr. Bierd, you turned in two other ledgers to me

16   this morning, correct?

17   A.   Yes.

18   Q.   And neither one of those ledgers went until 2012; is

19   that right?

20   A.   I don't think so.

21   Q.   Okay.  There was a payroll ledger; is that right?

22   A.   Yes.

23   Q.   Okay.  Do you recall how far that payroll ledger

24   went?

25   A.   It should be to present --
```

SHAWN BIERD - ADVERSE

24

1  Q.   I will --

2  A.   -- because that was -- I didn't print that out of

3  the register; I printed that out of the federal category.

4        MS. BUREAU:  The Court's indulgence, Your Honor.

5  Exhibit 3, please.

6  BY MS. BUREAU:

7  Q.   Sir, I've placed a document marked Exhibit 3 in

8  front of you.  Do you recognize that document?

9  A.   Yes.

10  Q.   Can you tell me what that is?

11  A.   Well, the first page is a payroll summary, the dates

12  requested by the government.

13  Q.   Can you tell me what the time span of that document

14  is?

15  A.   That would be -- well, the header on the top, I

16  printed it April 1st, 2003 through August 27th, 2012.

17  Q.   Are there any entries in that payroll summary for

18  2012?

19  A.   None.

20  Q.   Are there any entries in that summary for 2011?

21  A.   None.

22  Q.   Sir, do you maintain a list of people who work for

23  you in the business currently?

24  A.   No.

25  Q.   Do you have a phone list?

SHAWN BIERD - ADVERSE

1   A.    Probably on my cell phone.

2   Q.    So you store numbers --

3   A.    I probably have numbers stored on my cell phone,

4   yes.

5         THE COURT:  You probably do or you do have

6   numbers?

7         THE WITNESS:  Yeah.

8         THE COURT:  So your answer is yes?

9         THE WITNESS:  Yes, sir.

10        THE COURT:  Next question.

11  BY MS. BUREAU:

12  Q.    In the past year has Mr. Billy Stewart worked for

13  you?

14  A.    He has not.

15  Q.    In the past year has Gordon Tannahill worked for

16  you?

17  A.    Has not.

18  Q.    In the past year has Gabriel Winter worked for you?

19  A.    I don't believe so.

20  Q.    In the past year has Shane Bierd worked for you?

21  A.    Has not.

22  Q.    In the past year, Trent Bierd worked for you; is

23  that right?

24  A.    Yeah.

25  Q.    Can you tell me what Trent Bierd does at Advance

SHAWN BIERD - ADVERSE

1   Auto?

2   A.   Well, he's -- he wants to learn the business and

3   he's kind of hanging around.  He does cleanup.  He

4   does -- if I can run and get parts or something, he can

5   answer the phone, just general -- you can call him an

6   *apprentice.*

7   Q.   How old is Trent Bierd?

8   A.   He's 20.

9   Q.   How many hours per week does he work for you?

10  A.   Well, he's there most of the time.  But he's my son,

11  I'm his dad, and we get along rather well and he's with

12  me most of the time.

13  Q.   Do you pay him for his services?

14  A.   I pay him, yeah.  I mean, if he does work for me, he

15  gets paid.

16  Q.   Does he use tools in his work for you?

17  A.   Yes.

18  Q.   And where does he obtain those tools?

19  A.   They're mine.

20  Q.   Do you have a contract with him?

21  A.   I do not.

22  Q.   Is there anyone else currently working for you that

23  we haven't already talked about?

24  A.   Not currently, no.

25  Q.   How are you compensated for your work at Advance

SHAWN BIERD - ADVERSE

1  Auto?

2  A.   Well, I take pretty much a weekly check from my

3  company.

4  Q.   Do you write that check out to yourself?

5  A.   Yes.

6  Q.   Were you at the deposition of your wife this

7  morning?

8  A.   Yes.   In the past I had made them out to my wife as,

9  like I tried to explain that, as -- you weren't taking my

10  deposition -- but as a matter of convenience only.   I had

11  made -- I make checks out to my wife, she can put them

12  into the family account and take care of household

13  expenses.

14  Q.   The checks that you write to yourself, are they

15  in -- are they entered in any of the exhibits that are

16  now in front of you?

17  A.   They should be, yes.

18          THE COURT:   And you're looking now at exhibit

19  what?

20          THE WITNESS:   2.

21          THE COURT:   And does it have a pagination number

22  on the page you're referring to?

23          THE WITNESS:   I'm sorry?

24          THE COURT:   Is there a page number on the

25  document?

```
 1            THE WITNESS:  Yeah.

 2            THE COURT:  What page number?

 3            THE WITNESS:  Well, I found it first on 13.

 4            THE COURT:  All right.  And what's the entry

 5   that you're -- the date and the nature of the entry that

 6   you're referring to?

 7            THE WITNESS:  This one is 5/17/2012 entered in

 8   under Owner Draw.

 9            THE COURT:  And how much is it for?

10            THE WITNESS:  750, $750.

11            THE COURT:  Next question, Counsel.  It's page

12   13.

13   BY MS. BUREAU:

14   Q.   Sir, have you ever told the government that you have

15   independent contractors, before?

16   A.   Nobody has asked.

17   Q.   You were served with a complaint in this case; isn't

18   that right?

19            THE COURT:  Actually, two complaints, right?

20   A.   Yeah.  I have gotten a lot of papers from the

21   government.

22   Q.   And you were served with an order for preliminary

23   injunction; isn't that right?

24   A.   Yeah.  I'm sure that would probably be the title of

25   one of them.
```

 1  Q.   You were served with a copy of that order in

 2  December of 2011; isn't that right?

 3  A.   Preliminary injunction November 15th, 2011?

 4  Q.   Are you looking at a copy of the order of

 5  preliminary injunction, sir?

 6  A.   I think so.

 7  Q.   Is that a date that's on the top of it?

 8          THE COURT:   What's the title on the first page

 9  of the document?

10          THE WITNESS:   *Order of Preliminary Injunction*.

11          THE COURT:   The answer is yes, that's what

12  you're reviewing?   You need to answer yes or no, sir.

13          THE WITNESS:   It's dated the 7th of November.

14  BY MS. BUREAU:

15  Q.   And you were served later with a copy of this

16  injunction; isn't that right?

17  A.   I'm sure, yes.

18  Q.   Did you make any federal tax deposits after you

19  received a copy of this injunction order?

20  A.   I did not.

21  Q.   And why didn't you do that?

22  A.   Like I said, there was no one -- there weren't any

23  employees.

24  Q.   Did you ever contact me to tell me that you had no

25  employees?

SHAWN BIERD - ADVERSE

1   A.    No.

2   Q.    Did you ever contact anyone at the IRS to tell them

3   that you had no employees?

4   A.    No.

5   Q.    Did you ever file a Form 941 stating that your

6   business no longer had W-2 employees?

7   A.    No.

8   Q.    Besides Trent Bierd and Mr. Weber, is there anyone

9   else who has worked for you in the past year at Advance

10  Auto?

11  A.    I would say no.

12  Q.    Has someone named *Rochelle Mehren* (ph) ever worked

13  for you?  Has someone named *Rochelle Mehren* (ph) ever

14  worked for you

15  A.    No.

16  Q.    Has someone by the last name of *Mehren* (ph) ever

17  worked for you?

18  A.    I don't think so.

19  Q.    Who's currently at the business right now?

20  A.    My son.

21  Q.    Is there anybody else there?

22  A.    I don't know.  I'm not there.  My son is definitely

23  there.

24          MS. BUREAU:  I don't have anything further, Your

25  Honor.

SHAWN BIERD - ADVERSE

1              THE COURT:  Have the Bierds filed a personal tax

2     return each year?

3              MS. BUREAU:  No, they have not, Your Honor.

4              THE COURT:  Mr. Bierd, is there some reason why

5     you believed you did not have to file a tax return, you

6     personally?

7              THE WITNESS:  Me personally?

8              THE COURT:  Yes.

9              THE WITNESS:  Well, all of my studies, sir.  The

10    IRS tells me I'm frivolous, but I don't believe I have

11    any taxable -- taxable income.

12             THE COURT:  You believe that you're exempt from

13    filing a tax return?

14             THE WITNESS:  Correct.

15             THE COURT:  And what do you base that on?

16             THE WITNESS:  Well, I'm not a federal citizen,

17    as far as I know.  I don't work for the U.S. Government.

18             THE COURT:  Okay.

19             THE WITNESS:  And I don't think I --

20             THE COURT:  You understand that you live in the

21    United States of America?

22             THE WITNESS:  Geographically, not politically.

23             THE COURT:  You're a citizen of this country,

24    but you don't accept that; is that your position?

25             THE WITNESS:  That's not my political status.

1          THE COURT:  Okay.  You understand that under the

2  laws of the United States, you are considered a citizen

3  of this country whether you consider yourself one or not,

4  correct?

5          THE WITNESS:  I believe by presumption.

6          THE COURT:  All right.  And you also know that

7  under the laws of the United States, you are required to

8  file tax returns, correct?

9          THE WITNESS:  If I was a U.S. citizen, yes.  I

10  don't believe I am.

11          THE COURT:  You understand that hundreds of

12  millions of other people living in this country file tax

13  returns --

14          THE WITNESS:  I'm sorry.  I'm getting very dry

15  here.  I do understand that, sir.

16          THE COURT:  -- and are supporting the services

17  that you use, like the roads that you drive on?

18          THE WITNESS:  I believe that's funded by my gas

19  tax.

20          THE COURT:  But it's also funded by other taxes

21  and it funds the police officers who protect you; you

22  understand that?

23          THE WITNESS:  I pay a lot of local taxes.

24          THE COURT:  Not enough, sir, to cover the

25  expenses.  They also defend this country.  You understand

1    that other people are paying for the defense of this

2    country that you live in?

3            THE WITNESS:  Well, I don't want to sound

4    adversarial, but I don't believe the circumstances have

5    changed since the Grace Commission's report of 1984.

6            THE COURT:  My question is, sir, do you

7    understand that other people are paying for the defense

8    of this country that you are living in and you are not?

9            THE WITNESS:  I don't believe that's true, sir.

10   I believe that the -- well, I'll quote the Grace

11   Commission:  "Not one dime of our collected income tax

12   goes to pay for government services."  That was their

13   quote, not mine.  It's gone to service the debt, which

14   that's the basis, sir, of my lack of filing.

15           THE COURT:  And you understand that that

16   argument has been made all the way to the United States

17   Supreme Court and it has never been accepted?

18           THE WITNESS:  Well, sir, when you examine the

19   fact that we're in as much trouble as we are as a nation

20   financially -- I study this a lot -- we've been held

21   hostage by a banking cartel and I can't go along with it.

22   I believe it's a hundred-percent fraud, sir, and it

23   hasn't nothing to do with civic responsibility.

24           THE COURT:  Well, it has to do with the

25   consequences of your decision.  You understand that

1  ultimately you're violating federal law by not paying,

2  and are you prepared to accept the consequences of that

3  belief?  You're welcome to that belief, but then are you

4  prepared to accept the consequences of it?

5          THE WITNESS:  Well, is it an accurate argument?

6  Is it not accurate to say that we've been held hostage by

7  a banking cartel?

8          THE COURT:  It is not an accurate statement of

9  the law of this country as decided by Congress, the

10 President and the United States Supreme Court.  And

11 whatever you believe, it is not the law in this country

12 and there are consequences.  And I'm asking, are you

13 willing to accept the consequences of that belief?

14         THE WITNESS:  I don't want any harm to come to

15 me or my family; no, sir.

16         THE COURT:  Well, that's the consequence of your

17 continuing to refuse to comply with the tax laws of this

18 country.

19         THE WITNESS:  But if -- would you allow me to

20 explain?

21         THE COURT:  You're welcome to explain, but that

22 won't change what the law is.

23         THE WITNESS:  Yeah.  Well, the IRS Code was

24 enacted in the same year that the Federal Reserve Act was

25 enacted.  And, quite frankly, sir, I believe it's a

1    conspiracy against mankind.

2            THE COURT:  And you're welcome to that belief.

3    That's one of the wonderful things about our country.

4    You can believe whatever you'd like.

5            THE WITNESS:  But it's very well documented.

6            THE COURT:  But it doesn't change the fact that

7    the United States Supreme Court has rejected exactly this

8    argument repeatedly, as have every lower federal court

9    that's been presented with it.  And it is not an accurate

10   statement of the law and consequences will result.  I

11   just want to make sure that you understand the

12   consequences.

13           THE WITNESS:  I want to comply with whatever

14   this Court orders me to do because I have a

15   responsibility, first and foremost, to my family and my

16   community.  And I won't be able to do -- I will not be

17   able to uphold those responsibilities behind bars, so no,

18   sir.

19           THE COURT:  Well, then you need to comply with

20   the tax laws of this country.

21           THE WITNESS:  I'm --

22           THE COURT:  And I issued an order.  You know,

23   what really bothers me about this is that it's not just

24   wasting my time; it's wasting these people's time, it's

25   wasting the court reporter's time, it's wasting the

 1    clerk's time; it's wasting federal officers, marshals who

 2    had to go out and serve you with documents.

 3        And now, as you sit here in front of me, for the

 4    first time it's dawned on you that there are consequences

 5    to contempt for this court and for the laws of the United

 6    States.  That really bothers me because we had to go

 7    through all of this effort in order to get you to finally

 8    accept what is the law and unequivocally the law of this

 9    country.  And I don't know, sir, how you can sit here and

10    take that position.

11        THE WITNESS:  Isn't that the spirit of what this

12    country was founded on?

13        THE COURT:  It is if you're willing to accept

14    the consequences of it; yes, sir.  You have every right

15    to refuse to comply with the law and then you can go to

16    jail.  But to show up here at the eleventh hour and tell

17    me, oh, no, I don't want to go to jail, it's just

18    astounding to me.  What makes you so much better than

19    anyone else in this country?

20        THE WITNESS:  I am not better than anyone else

21    in this country.

22        THE COURT:  Well, apparently you are because you

23    think you're free to decide what the law of the United

24    States is; and you are not, sir, any more than I am or

25    anybody else is able to.  We all have to comply with the

1  law or accept the consequences of not complying with the

2  law, and now you're telling me you don't want the

3  consequences.

4      All right.  You may step down.  Does the government

5  have anything further they wish to present?

6          MS. BUREAU:  Your Honor, based on Mr. Bierd's

7  testimony, he hasn't met his burden of showing that in

8  fact he couldn't comply with the order.  His testimony

9  does not indicate that those are independent contractors.

10 It seems to indicate that in fact those are employees

11 operating under his control.

12     So for those reasons, Your Honor, we'd reiterate our

13 request that he be held in contempt of court.  He hasn't

14 met his burden to prove that he had a reasonable basis

15 for not complying with the Court's order.

16          THE COURT:  All right.  Mr. Bierd, anything more

17 you wish to say to the Court before I determine if you

18 are in contempt of court?

19          MR. BIERD:  Sir, the spirit that is within me is

20 not a spirit of rebellion; it's a spirit of I believe

21 responsibility.  I believe that -- you mentioned the

22 eleventh hour.  I believe we're past the eleventh hour of

23 this country's fate.  I believe we're in serious trouble,

24 sir.  And if something is not done -- I believe, as an

25 individual, I'm doing everything within my power as an

1  individual.  I'm one man.

2          THE COURT:  And I would have so much more

3  respect for your position if you were willing to accept

4  the consequences of it, but you are in contempt of this

5  Court's order.  You have flouted the tax laws of the

6  United States --

7          MR. BIERD:  I've communicated --

8          THE COURT:  -- and I find you in contempt of

9  Court.  Now, the question is, what is the result of that

10  determination.  And I'll hear from the government as to

11  what you would ask for at this point.

12          MR. BIERD:  Sir?

13          MS. BUREAU:  May I have a moment to consult with

14  the IRS?

15          THE COURT:  You may.

16          MR. BIERD:  Sir?

17          THE COURT:  I'll give you a moment.

18          MR. BIERD:  Okay.

19          MS. BUREAU:  Your Honor, Mr. Bierd has had

20  almost a year now to comply with the Court's preliminary

21  injunction order or I believe it's about nine months.  If

22  the Court -- he's indicating now that he wants to comply.

23  If the Court wishes to give him more time, we'd ask that

24  it be no more than 30 days to comply with paying his

25  employees correctly and beginning to make federal tax

1  deposits.  We would ask that there be no further delay in

2  getting him to comply because he has had plenty of time

3  to do so.

4       THE COURT:  What are the circumstances of his

5  personal income taxes, what is the government's position,

6  or are you just today concerned with his treatment of the

7  employees that work for him?

8       MS. BUREAU:  Just the employees, Your Honor.

9  The personal income taxes were not referred to the

10  Department of Justice or -- may I have a moment to

11  consult, Your Honor?

12       THE COURT:  You may.

13       MS. BUREAU:  Yes, Your Honor, that particular

14  matter has not been referred to the Department of

15  Justice.  Additionally, Your Honor, if the Court is going

16  to give him some amount of time to comply with the

17  preliminary injunction order, we would also ask that the

18  defendant produce documents so that we can verify exactly

19  who was paid in the past year since the preliminary

20  injunction order, exactly how much they were paid, so

21  that the IRS can make sure that this is accurate and that

22  any 941 returns that are filed are indeed accurate.

23       THE COURT:  All right.  I am going to give

24  Mr. Bierd seven days to comply with this Court's

25  preliminary injunction order.  If, at the end of those

1   seven days, I have not received a notice from the

2   government that you are in compliance, you will be

3   arrested and held until you have complied with this

4   Court's order, the order of preliminary injunction.  If

5   you have any questions about that, I would say you work

6   closely with the government because it will be their

7   representation that I will follow.

8        Second, you will make available all the records of

9   your business, between the hours of 8 a.m. and 6 p.m.,

10  each workday, now until you have fully complied.

11            MR. BIERD:  Okay.  May I add something, sir?

12            THE COURT:  You may.

13            MR. BIERD:  I just want to say that I haven't

14  bucked any notice.  I haven't bucked any kind of

15  communication with the IRS.

16            THE COURT:  You've bucked an order of

17  preliminary injunction from this Court.

18            MR. BIERD:  I have a record of communication

19  with all the people involved with this all the way back.

20            THE COURT:  Sir, unless I get notice of

21  compliance, you're going to be in jail the next time I

22  see you.

23            MR. BIERD:  And, yes, sir, I am going to do the

24  best I can to get this resolved as soon as possible and

25  comply with your order.

1          THE COURT:  All right.

2          MR. BIERD:  But I just want the record to show

3    that I have not neglected any of this.  I've been trying

4    to get an answer.

5          THE COURT:  On the contrary, sir.  You have

6    acted in contempt of court.  You have neglected your

7    responsibilities with respect to the withholdings and

8    income taxes for what are certainly employees of your

9    company.  And to the extent your position is they are

10   not, you still had obligations to make filings with

11   respect to independent contractors.  You've done none

12   of that.

13       In fact, you've testified under oath today that you

14   purposefully paid people in cash to avoid their having

15   responsibility to pay their income taxes and you yourself

16   have not filed income taxes either.

17       And the last statement I'll make for the record is

18   that I also will refer you for prosecution by the

19   Department of Justice for flouting the laws of the United

20   States with respect to your own income taxes.  It will be

21   up to the Department of Justice whether they prosecute.

22   But I have heard nothing today that would cause me to

23   think that you are not -- you have not violated criminal

24   laws of the United States of America.

25       And whether or not you are willing to accept the

1  consequences of that decision and whether or not you

2  think you are fully justified, there are consequences for

3  that behavior.  And more than most of the criminal

4  defendants I've had in my courtroom, I believe you are

5  deserving of that consequence.

6      In any event, we will stand adjourned and the Court

7  will enter an order consistent with -- I'm sorry, in

8  recess -- the Court will enter an order consistent with

9  its ruling today.  Anything further for the government?

10      MS. BUREAU:  Yes, Your Honor.  I just wanted to

11  reiterate a request for a default judgment, including a

12  default judgment of permanent injunction along identical

13  terms with the preliminary injunction.

14      THE COURT:  You have a default.

15      MS. BUREAU:  Okay.

16      THE COURT:  I am willing to make part of that,

17  of the ultimate default judgment, continued compliance

18  with the preliminary injunction.  But we're not done with

19  respect to -- you have a request for damages.  I haven't

20  been given any evidence of those damages.  Obviously, I

21  have the complaint, but the government will have to

22  establish what monetary damages are appropriate here and

23  that has yet to be determined.

24      MS. BUREAU:  I will submit certificates of

25  assessment and payment of the taxes involved, Your Honor.

1           THE COURT:  All right.  And I encourage you to

2    provide the factual background for it, whatever that is.

3    A simple certificate -- I believe my responsibility is to

4    establish actual damages, which even with the defendant's

5    default, still requires that I have some documentation of

6    it, and I will await that submission.

7           MS. BUREAU:  Yes, Your Honor.

8           THE COURT:  Very good.  We'll will stand in

9    recess then.

10        (Adjourned at 1:58 p.m.)

11

12                           * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, CHERYL A. SEEMAN, Certified Realtime and

2   Merit Reporter, in and for the State of Wisconsin,

3   certify that the foregoing is a true and accurate record

4   of the proceedings held on the 30th day of August, 2012,

5   before the Honorable William M. Conley, Chief Judge of

6   the Western District of Wisconsin, in my presence and

7   reduced to writing in accordance with my stenographic

8   notes made at said time and place.

9   Dated this 14th day of September, 2012.

10

11

12

13

14

15                           _____ /s/

16                           Cheryl A. Seeman, RMR, CRR
                             Federal Court Reporter
17

18

19

20

21

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
24  under the direct control and/or direction of the
    certifying reporter.
25